MARK M. HATHAWAY
(CA 151332; DC 437335; IL 6327924; NY 2431682)
JENNA E. PARKER (CA 303560)
HATHAWAY PARKER
445 S. Figueroa Street, 31st Floor
\Los Angeles, California 90071
Telephone: (213) 529-9000
Facsimile: (213) 529-0783
E-Mail: mark@hathawayparker.com
E-Mail: jenna@hathawayparker.com

Attorneys for Plaintiff

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| BRYCE DIXON, an individual,<br><br>   Plaintiff,<br><br>v.<br><br>UNIVERSITY OF SOUTHERN CALIFORNIA, a California corporation, and DOES 1 to 50 inclusive,<br><br>   Defendants. | Case No.:<br><br>**COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF**<br><br>1. Title IX-Erroneous Outcome<br>2. Title IX-Selective Enforcement<br>3. Violation of the UNRUH Civil Right Act<br>4. Breach of Contract<br>5. Promissory Estoppel<br>6. Negligence<br>7. Intentional Infliction of Emotional Distress |

COMES NOW PLAINTIFF Bryce Dixon ("Plaintiff" or "Mr. Dixon"), by and through his attorneys Hathaway Parker, as and for his Complaint, respectfully alleges as follows:

### OVERVIEW OF THIS ACTION

1. Defendant University of Southern California has created a gender-biased hostile environment on their campuses for males, like Plaintiff, who have been falsely accused of sexual misconduct. This hostile environment has arisen, in part, due to Defendant's pattern and practice of authorizing the discipline of male students in the absence of evidence of misconduct and without providing any semblance of due process or fairness.

Despite having ample notice of the hostile environment, Defendant ignored recommendations and reneged on commitments to provide equality and due process for all.

2.   It is no secret that over the past few years, various courts including this one, have seen a substantial increase in litigation brought by male students against universities alleging a mishandling of sexual misconduct allegations and biased proceedings leading to unwarranted sanctions.

3.   Not surprisingly, cases of wrongful allegations of sexual misconduct have abounded, as illustrated by the Rolling Stone's article on "Jackie," an alleged rape victim at the University of Virginia.[1]  Also discredited, Columbia University student Emma Sulkowicz, who spent her final year at Columbia toting a mattress to protest the university's supposed failure to punish her alleged rapist.[2]  Ms. Sulkowicz even became something of a spokesperson for rape victims and was invited to attend the State of the

_____

[1] *A Rape on Campus* by Sabrina Erdely was published in the December 4, 2014 issue of Rolling Stone.  The article has since been retracted and the Virginia Alpha Chapter of the Phi Kappa Psi fraternity paid $1.65 million in a settlement with Rolling Stone over the discredited article.  (Sydney Ember, *Rolling Stone to Pay $1.65 Million to Fraternity Over Discredited Rape Story*, The New York Times (June 13, 2017) https://www.nytimes.com/2017/06/13/business/media/rape-uva-rolling-stone-frat.html.)

[2] Emma Sulkowicz waited seven months to report her allegations to Columbia University.  After investigation by the university and law enforcement, Paul Nungesser, the accused student, was cleared of the charges.  Ms. Sulkowicz tried to get other women to accuse Mr. Nungesser of sexual assault, but Columbia University found him not responsible for those claims as well.  On April 23, 2015, Mr. Nungesser sued Columbia University for being complicit in allowing the harassment from his accuser, which "significantly damaged, if not effectively destroyed Paul Nungesser's college experience, his reputation, his emotional well-being and his future career prospects." The lawsuit includes dozens of Facebook messages between the two former friends and many declarations of Ms. Sulkowicz's love for Mr. Nungesser before and after the alleged rape. (See Mona Charen, *It's High Time Columbia's Mattress Girl Was Discredited*, National Review (August 4, 2017) https://www.nationalreview.com/2017/08/columbia-university-mattress-girl-emmas-sulkowicz-paul-nungesser-lawsuit-rape-accusation-exonerated/.)

Union address with Senator Kirsten Gillibrand (D-New York).  Then there are the discredited claims of Erica Kinsman and of Kamilah Willingham, who had been featured in the movie, "The Hunting Ground."[3]

4.  In "An Open Letter to Higher Education about Sexual Violence" from Brett A. Sokolow, Esq. and The NCHERM Group Partners, dated May 27, 2014, Mr. Sokolow provides examples of sexual misconduct cases where the college or university is holding the male student accountable in spite of the evidence—or the lack thereof—"because they think they are supposed to, and that doing so is what OCR wants."[4] Finally, numerous rights organizations have spoken out on the issue, including the Foundation for Individual Rights in Education, https://www.thefire.org/, the National Coalition For Men Carolinas (NCFMC), http://www.ncfmcarolinas.com/,  Stop Abusive and Violent Environments (SAVE) http://www.saveservices.org/, and Families Advocating for Campus Equality (FACE) https://www.facecampusequality.org/.

5.  In short, there is an apparent epidemic of false allegations and wrongful convictions.

---

[3] See, Ivan B. K. Levingston, Film 'The Hunting Ground' Misrepresents Harvard Sexual Assault Statistics, The Harvard Crimson (March 26, 2015) https://www.thecrimson.com/article/2015/3/26/hunting-ground-film-statistics/; Emily Yoffe, How The Hunting Ground Blurs the Truth, Slate (June 1, 2015) https://slate.com/news-and-politics/2015/06/the-hunting-ground-a-closer-look-at-the-influential-documentary-reveals-the-filmmakers-put-advocacy-ahead-of-accuracy.html; Asche Schow, The continuing collapse of 'The Hunting Ground,' a campus sexual assault propaganda film, Washington Examiner (June 3, 2015) https://www.washingtonexaminer.com/the-continuing-collapse-of-the-hunting-ground-a-campus-sexual-assault-propaganda-film.

[4] The NCHERM Group, the largest higher education specific law practice in the country, has worked with 3,000 higher education clients in the past 17 years, and frequently represents universities being investigated by the Department of Education, Office for Civil Rights ("OCR"), a sub-agency of the United States Department of Education.  The NCHERM Group are the founders of ATIXA, a membership association of more than 1,400 campus Title IX coordinators and investigators, that produces training materials and seminars, publications, and conferences.

COMPLAINT FOR DAMAGES

6.   A national survey found that nearly one in 10 persons reported they had been falsely accused of sexual assault, domestic violence, or child abuse.[5] In the United States, more than 2,000 exonerations have been documented to date, representing nearly 21,000 person-years of life lost.[6] False accusations and perjury are the leading contributor to wrongful convictions.[7]

7.   To protect against false allegations, abuse of Title IX, and wrongful convictions, it is critical for universities to enforce investigation and adjudication procedures that are thorough, objective, and fair.

8.   USC has not done that. Instead, its procedures are biased, pre-determined, and unfair.

9.   Defendant breached a contractual agreement with Plaintiff, breached a duty of care to Plaintiff, discriminated against Plaintiff on the basis of sex, and failed to follow applicable federal and state laws prohibiting discrimination.

10. USC has failed in its commitment to provide equal opportunities to both male and female students in its campus programs.

11. USC's unlawful treatment of Plaintiff was motivated by gender bias against male students as part of a troubling trend at colleges and universities nationwide involving unfair and biased investigations—and severe and unwarranted discipline—that is devastating innocent male students.

12. This process has taken an immense toll on Plaintiff's mental and emotional health, significantly damaged his reputation, and caused him to lose the benefit of his college experience.

13. Having been irreparably harmed by false allegations of sexual misconduct, and

---

[5] http://www.saveservices.org/falsely-accused/survey/
[6] http://www.law.umich.edu/special/exoneration/Pages/about.aspx.
[7] http://www.law.umich.edu/special/exoneration/Pages/ExonerationsContribFactors ByCrime.aspx?fbclid=IwAR28BGmjvPShLzZeocntm-u499Q-rY-FUxrdQi-nRlSdlyCl3MfwcpYoOXQ

COMPLAINT FOR DAMAGES
4

Defendant's response to those allegations, Plaintiff seeks by this action to remedy the emotional, mental, economic, and physical harm caused by Defendants.

## THE PARTIES

14. Plaintiff BRYCE DIXON is a natural person, citizen of the United States, and resident of the State of California.  During the events described herein, he was an undergraduate student at the University of Southern California, a member of the USC football team, and attending USC on a full scholarship.

15. Defendant UNIVERSITY OF SOUTHERN CALIFORNIA (hereinafter "USC" or "University"), is a California non-profit corporation and the official name of the private research university founded in 1880 with its main campus in Los Angeles, California.

16. The true names of defendants identified as DOES are unknown to Plaintiff.  On information and belief the DOE defendants 1-25 were the agents or employees of defendant USC acting within the scope of that agency or employment and in their official capacities.  DOE defendants 26-50 are persons whose capacities are unknown to Plaintiff.

## JURISDICTION AND VENUE

17. This Court has federal question and supplemental jurisdiction pursuant to 28 U.S.C. § 1331 and under 28 U.S.C. § 1367 because John Doe states claims arising under the Constitution and laws of the United States, including Title IX of the Education Amendments of 1972, 20 U.S.C. §§ 1681-88.

18. This Court has personal jurisdiction over Defendant USC on the grounds that the University is conducting business within the State of California.

19. Venue for this action properly lies in this Central District pursuant to 28 U.S.C. § 1391 because USC is considered to reside in this judicial district and a substantial part of the events or omissions giving rise to the claim occurred in this judicial district

20. Plaintiff succeeded in his mandamus action against USC and has exhausted his judicial remedies.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**FACTUAL ALLEGATIONS**

**I. POLITICAL AND SOCIAL ENVIRONMENT**

21. This case arose amidst the national controversy stemming from the Office for Civil Rights ("OCR") threatening to withhold federal dollars in order to impose its guidance on colleges and universities as to how to investigate and adjudicate allegations of sexual misconduct[8] in order to stem a purported tide of sexual violence on American college campuses.[9]

22. OCR's efforts affected the rights of some 20.6 million undergraduate and graduate students in the United States, as well as the distribution of more than $116 billion in federal education funds each year.[10]

23. OCR's threatened withholding of funds put tremendous pressure upon universities like USC to (a) aggressively prosecute males accused of sexual misconduct; (b) severely discipline male students alleged to have engaged in sexual misconduct regardless of their innocence,[11] and (c) equate complainants in sexual misconduct proceedings as being

---

[8] See, David G. Savage and Timothy M. Phelps, How a Little-known Education Office Has Forced Far-reaching Changes to Campus Sex Assault Investigations, (August 17, 2015) Los Angeles Times https://www.latimes.com/nation/la-na-campus-sexual-assault-20150817-story.html

[9] "This is an issue of political correctness run amok," according to Alan M. Dershowitz, emeritus Harvard Law professor who was among twenty-eight Harvard Law School faculty members asserting that new rules violate the due process rights of the accused. (See, Rethink Harvard's Sexual Harassment Policy, The Boston Globe (Oct. 15, 2014) https://www.bostonglobe.com/opinion/2014/10/14/rethink-harvard-sexual-harassment-policy/HFDDiZN7nU2UwuUuWMnqbM/story.html) "As teachers responsible for educating our students about due process of law, the substantive law governing discrimination and violence, appropriate administrative decision-making, and the rule of law generally, we find the new sexual harassment policy inconsistent with many of the most basic principles we teach." (Id. See also, Richard Dorment, Occidental Justice, (April 2015) Esquire; Teresa Watanabe, More College Men Are Fighting Back Against Sexual Misconduct Cases (June 7, 2014) Los Angeles Times.

[10] Source: https://studentaid.ed.gov/sa/about/data-center/student/title-iv

[11] A 2015 study examined why a high "percentage of sexual assault allegations are

COMPLAINT FOR DAMAGES

6

female "victims"  who must receive preferential treatment and are presumed to be survivors of an actual sexual assault, requiring the accused student to overcome that presumption and prove their innocence.

24. OCR's efforts to enforce Title IX compliance applies to all public and private educational institutions that receive federal funds, including USC.

25. The issue of sexual assaults on college and university campuses is, at the federal level, primarily addressed by an act of Congress known as Title IX of the Education Amendments of 1972, 20 U.S.C. §§ 1681-1688.  Title IX of the Education Amendments of 1972 provides, in relevant part, that: "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance."

26. Under U.S. Supreme Court precedent, Title IX allows private parties to sue educational institutions receiving federal funds for "intentional discrimination." (*Jackson v. Birmingham Bd. of Educ*. (2005) 544 U.S. 167, 173.)

27. The meaning of "discrimination" under Title IX is "differential treatment" or "less favorable treatment." (*Id.* at 174.) "Discrimination" "covers a wide range of intentional unequal treatment." (*Id.* at 175.)

28. From Title IX's enactment in 1972 until 1997, the Department of Education never asserted jurisdiction over student-on-student rape or sexual assault.  In 1997, however, the Department issued regulations that required schools to have policies and procedures in place to deal with such conduct.[12]

29. The Department's ultimate directive was that grievance procedures to resolve

---

false" and the rationale behind many of these false allegations as being "retribution for a real or perceived wrong, rejection or betrayal." Reggie D. Yager, What's Missing From Sexual Assault Prevention and Response, (April 22, 2015), pgs. 46–62 http:ssrn.com/abstract=2697788.

[12] See generally Stephen Henrick, A Hostile Environment for Student Defendants: Title IX and Sexual Assault on College Campuses, 40 N. Ky. L. Rev. 49, 56-59 (2013).

student complaints must be "prompt and equitable." (34 C.F.R. §106.8(b).) These procedures must ensure that both sides are treated equally.

30. In 2001, the Department's Office of Civil Rights (OCR) issued guidance after public notice and opportunity to comment in a document entitled "Revised Sexual Harassment Guidance: Harassment of Students by School Employees, Other Students, or Third Parties" ("2001 Guidance"), available at http://www2.ed.gov/about/offices/list/ocr/docs/shguide.pdf.

31. OCR's 2001 Guidance required that schools provide the following procedural guarantees:

1) Notice to students, parents of elementary and secondary students, and employees of the procedure, including where complaints may be filed;

2) Application of the procedure to complaints alleging harassment carried out by employees, other students, or third parties;

3) Adequate, reliable, and impartial investigation of complaints, including the opportunity to present witnesses and other evidence;

4) Designated and reasonably prompt timeframes for the major stages of the complaint process;

5) Notice to the parties of the outcome of the complaint; and

6) An assurance that the school will take steps to prevent recurrence of any harassment and to correct its discriminatory effects on the complainant and others, if appropriate.

(2001 Guidance at 20.)

32. OCR's 2001 Guidance further provided that "according due process to **both** parties involved, will lead to sound and supportable decisions." (*Id.* at 22. Emphasis added.)

33. The due process requirement applies to both public and private colleges and universities. (*Id.* at 22.)

34. OCR's 2001 Guidance required that "the school must make sure that all designated employees have adequate training as to what conduct constitutes sexual harassment and

are able to explain how the grievance procedure operates." (*Id.* at 21.)

35. On April 4, 2011, the OCR issued, ***without*** public notice and comment, a guidance letter to colleges and universities in the United States in receipt of federal funding, which became widely known as the "Dear Colleague Letter" (the "DCL").[13] The DCL advised recipients that sexual violence constitutes sexual harassment within the meaning of Title IX of the Education Amendments of 1972, 20 U.S.C. §1681 et seq. and its regulations, and directed schools to "take immediate action to eliminate the harassment, prevent its recurrence and address its effects."

36. The DCL responding, in part, to a special investigative report published by National Public Radio and the Center for Public Integrity, which proclaimed a campus rape epidemic and criticized the OCR for its lax response to what the report characterized as a social problem of critical importance,[14] dramatically re-wrote the expectations of Title IX enforcement at colleges and universities.

37. The investigative report described in detail the obstacles faced by sexual assault victims in obtaining redress though college disciplinary proceedings and how victims who did engage in the college disciplinary process suffered additional trauma as a result. Much of the report focused on underreporting, re-traumatization of victims, rape myth adherence on college campuses, and young men's cultural adherence to the sexual aggressor role.

38. The DCL, further, relied on faulty statistics in sounding a "call to action" for campuses nationwide—that "about 1 in 5 women are victims of completed or attempted sexual assault while in college." The researchers behind this study subsequently invalidated that statistic as a misrepresentation of the conclusions of the study and warned that it was "inappropriate to use the 1-in-5 number as a baseline…when discussing our country's problem with rape and sexual assault."[15] Relying on these faulty

---

[13] Available at: https://www2.ed.gov/about/offices/list/ocr/letters/colleague-201104.pdf

[14] *See* http://www.npr.org /templates/story/story.php?storyId=124001493

[15] Christopher Krebs and Christine Lindquist, *Setting the Record Straight on '1 in 5'*,

numbers, the DCL minimized due process protections for the accused by, among other things, eschewing any presumption of innocence, mandating a preponderance of the evidence standard, limiting cross-examination, and forbidding certain forms of alternative dispute resolution.

39. Despite evidence that those numbers were faulty, USC often repeats the allegation that "1 in 4" or "1 in 5" female college students are sexually assaulted during their college career.

40. These numbers are in stark contrast to a report issued by the American Association of University Women noting that over 90% of the colleges and universities in the United States reported none of their students were raped in 2014.[16] Similarly, a "special report from the Bureau of Justice Statistics titled 'Rape and Sexual Assault Victimization Among College-Age Females, 1995-2013' . . . found . . . female college students . . . are less likely to be victims of sexual assault than their peers who are not enrolled in college. The report found . . . the incidence [of sexual assault] . . . was far lower than anything approaching 1 in 5: 0.76 percent for nonstudents and 0.61 percent for students."[17]

41. In addition, academics conducting a research study found approximately 50% of sexual assault allegations at two Midwestern American colleges were false.[18]

42. Other academic papers have exposed the lack of objective proof behind a "consensus among legal academics that only two percent" of sexual assault allegations

---

Time (December 15, 2014) http://time.com/3633903/campus-rape-1-in-5-sexual-assault-setting-record-straight/

[16] Amy Becker, *91 Percent of Colleges Reported Zero Incidents of Rape in 2014*, American Association of University Women (Nov. 23, 2015) https://www.aauw.org/article/clery-act-data-analysis/

[17] Emily Yoffe, *The Problem with Campus Sexual Assault Surveys*, SLATE (Sept. 24, 2015) https://slate.com/human-interest/2015/09/aau-campus-sexual-assault-survey-why-such-surveys-dont-paint-an-accurate-portrait-of-life-on-campus.html

[18] See, Eugene J. Kanin, *False Rape Allegations Archives of Sexual Behavior*, Vol. 23 No.1 (1994) https://archive.org/details/FalseRapeAllegations

are false.[19]

43. Although the Dear Colleague letter reinforced OCR's 2001 Guidance requirement that both parties "must have an equal opportunity to present relevant witnesses and other evidence," it stated that colleges and universities "must use a preponderance of the evidence standard (i.e., it is more likely than not that sexual harassment or violence occurred)," and could not use the "clear and convincing standard (i.e., it is highly probable or reasonably certain that the sexual harassment or violence occurred." (DCL at 11.)

44. Although the DCL proclaimed to merely offer "additional guidance," OCR treated it as binding on colleges and universities for all practical purposes, thereby pressuring colleges and universities to aggressively pursue investigations of sexual harassment and sexual assaults that touched upon campus life, no matter how remote.

45. In fact, the DCL contained an explicit threat to colleges and universities: "When a recipient does not come into compliance voluntarily, OCR may initiate proceedings to withdraw Federal funding by the Department or refer the case to the U.S. Department of Justice for litigation." (DCL at 16.)

46. Confirming this stance, Catherine E. Lhamon, then the Assistant Secretary of Education and head of OCR, stated in a June 2014 Senate Hearing that if colleges and universities did not comply with the DCL, there would be "enforcement intervention from my office or from the Department of Justice."[20]

47. On April 29, 2014, OCR issued additional directives to colleges and universities in the form of a guidance document titled Questions and Answers on Title IX and Sexual

---

[19] See, Edward Greer, The Truth behind Legal Dominance Feminism's Two-Percent False Rape Claim Figure, 33 Loy. L.A.L. Rev. 947 (2000) https://digitalcommons.lmu.edu/llr/vol33/iss3/3/; see also KC Johnson and Stuart Taylor, The Campus Rape Frenzy: The Attack on Due Process at America's Universities (January 24, 2017) Encounter Books; see Reggie D. Yager, What's Missing From Sexual Assault Prevention and Response (April 22, 2015) http:ssrn.com/abstract=2697788
[20] https://www.help.senate.gov/imo/media/doc/Lhamon.pdf

Violence ("Q&A") which was aimed at addressing campus sexual misconduct policies, including the procedures colleges and universities "must" employ "to prevent sexual violence and resolve complaints" and the elements that "should be included in a school's procedures for responding to complaints of sexual violence."[21] The Q&A advised schools to adopt a trauma informed approach, advising, for example, that hearings should be "conducted in a manner that does not inflict additional trauma on the complainant." While the Q&A advised that "the rights established under Title IX must be interpreted consistently with any federally guaranteed due process rights…a school should ensure that any due process rights do not restrict or unnecessarily delay the protections provided by Title IX to the complainant.

48. In April 2014, the White House issued a report entitled "Not Alone,"[22] which included a warning that if OCR finds that a Title IX violation occurred, the "school risks losing federal funds" and that the Department of Justice ("DOJ") shares authority with OCR for enforcing Title IX and may initiate an investigation or compliance review of schools. Further, if a voluntary resolution cannot be reached, the DOJ may initiate litigation.

49. In July 2014, Lhamon reaffirmed this position, threatening a group of university administrators to "not think [loss of funding is] an empty threat."[23]

50. Recognizing the extreme external pressure the OCR was able to place upon schools, Lhamon opined, in 2016, that "[i]t's nice when you carry the big stick of the

---

[21] Available at: https://www2.ed.gov/about/offices/list/ocr/docs/qa-201404-title-ix.pdf
[22] Available at: https://www.justice.gov/archives/ovw/page/file/905942/download
[23] See, e.g., Rachel Axon, Feds Press Colleges on Handling of Sex Assault Complaints, USATODAY (July 14, 2014), https://www.usatoday.com/story/sports/ncaaf/2014/07/14/college-sexual-assaults-dartmouth-summit/12654521/; Tyler Kingkade, Colleges Warned They Will Lose Federal Funding For Botching Campus Rape Cases, THEHUFFINGTONPOST (July 14, 2014), https://www.huffpost.com/entry/funding-campus-rape-dartmouth-summit_n_5585654.

federal government."[24]

51. Lhamon, describing the extensive external pressure OCR was able to place upon colleges and universities, was quoted saying, "It's not surprising to me that we haven't gone to the last step … It means the process is working."[25]

52. There is no doubt that college presidents believed that the DCL issued "crisp marching orders from Washington."[26]

53. To support enforcement of the DCL the OCR hired hundreds of additional investigators.  To date, OCR has resolved 197 investigations of colleges for the potential mishandling of complaints of sexual violence, while 305 cases remain open.[27]

54. While investigating the allegations against Plaintiff, USC was also under investigation by OCR for its alleged mishandling of sexual misconduct complaints.[28]

55. In order to further influence the colleges and universities with external pressure, the OCR released the names of institutions it was investigating.[29]

56. In addition to the national pressure faced by USC, the State of California was conducting its own audit of colleges and universities in 2014.[30]

---

[24] Scooby Axson, Explaining Title IX and How Sexual Assaults Are Prosecuted on College Campuses, https://www.si.com/college/2016/10/21/title-ix-sexual-assault-explained.

[25] Meredith Clark, "Official to colleges: Fix sexual assault or lose funding," MSNBC (July 15, 2014), https://www.msnbc.com/msnbc/campus-sexual-assault-conference-dartmouth-college-msna368981#51832.

[26] Libby Sander, "Colleges Are Reminded of Federal Eye on Handling of Sexual-Assault Cases," Chronicle of Higher Education (Feb. 11, 2014)

[27] Source: https://projects.chronicle.com/titleix/

[28] See https://www2.ed.gov/about/offices/list/ocr/docs/investigations/more/09132294-a.pdf; https://dailytrojan.com/2018/03/16/federal-government-concludes-investigation-into-uscs-title-ix-policies-finds-usc-complied-with-recommended-changes/.

[29] Michael Stratford, The Government's New List, Inside Higher Ed, (May 2, 2014) https://www.insidehighered.com/news/2014/05/02/us-names-colleges-under-investigation-sexual-assault-cases.

[30] http://www.auditor.ca.gov/pdfs/reports/2013-124.pdf.

57. The result of the California audit was a conclusion that "California Universities Must Better Protect Students by Doing More to Prevent, Respond to, and Resolve Incidents."[31]

58. As a result, USC was under immense external pressure at the time of the incident underlying this Complaint.

59. The foregoing combination ongoing OCR investigations, state investigations, and pressure from the United States Department of Education, under a threat of recession of federal funds, contributed to an overzealous prosecution and erroneous finding of responsibility against Plaintiff.

60. Recognizing this issue of overzealous prosecution, in public remarks given at George Mason University on September 7, 2017, Former Education Secretary Betsy DeVos described the protocol for handling sexual misconduct allegations on university campuses as a "failed system."[32]

## II. INTERNAL POLICIES, PROCEDURES, AND SOCIAL ENVIRONMENT

61. At the time of Jane Roe' accusation against Mr. Dixon, USC, in response to OCR's guidance as set forth above and the investigation into USC's prior mishandling of sexual misconduct complaints, adopted procedures that lacked even the most basic elements of fairness and due process. The procedures were overwhelmingly stacked against the accused male students and were in no way required by Title IX law or any other federal or state regulation.

62. Specific procedures were as follows:

    a. USC placed the responsibility for the investigation, prosecution, fact-

---

[31] Adolfo Guzman-Lopez, Violence on College Campuses. Here's What's Changed and What Hasn't, LAist (Feb. 16, 2021) https://laist.com/news/sexual-assault-violence-california-colleges-universities-audit.

[32] Available at: https://www.ed.gov/news/speeches/secretary-devos-prepared-remarks-title-ix-enforcement

finding, and issuance of sanctions for each sexual misconduct complaint all in the hands of a single individual – a "Title IX Investigator," who acted as police, prosecutor, and judge.

b. USC conducted no evidentiary hearing at all. Instead, it relied upon the Title IX Investigator to reach her own conclusions without a hearing, based upon her review of the interviews and evidence she gathered as part of her own investigation.

c. USC appointed sexual assault victims' advocates to serve as Title IX Investigators, thus reflecting its apparent and actual bias against male students.[33]

d. While the accused male student was permitted to have an attorney present when meeting with the USC Title IX Investigator, the attorney was required to keep silent and was not permitted to actively participate or act as a spokesperson or advocate for the accused.

e. The Title IX Investigator's conclusions and sanctions were subject to administrative appellate review to an anonymous Student Behavior Panel. USC would not disclose the identity, training, nor qualifications of the members of the Student Behavior Panel, nor would it disclose the Panels rules and manner of deliberations. As such, evidence of internal bias was deliberately kept hidden from the accused.

f. USC Title IX Personnel acted as advocates for alleged victims, failing to recognize that a complainant was only an alleged victim until it was proven that a violation actually occurred and instead assuming that the complainant was a victim. USC Title IX personnel focused on validating the initial allegations of the sexual misconduct, rather than on determining whether the

---

[33] USC Title IX personnel and Office of Equity and Diversity also lacked gender diversity. https://equity.usc.edu/who-we-are/.

COMPLAINT FOR DAMAGES

15

misconduct actually occurred.

  g. USC generally referred (and still refers) to complainants as victims or survivors and offered complaining students significant resources, while offering no support to the accused male students.

63. Dr. Keegan Allee, who was the sole investigator, prosecutor, and adjudicator in this matter had a history as an advocate of victims of sexual assault and domestic violence. In fact, prior to joining USC, Dr. Allee was an Advocate Support Specialist in the UC Santa Barbara Rape Prevention Education Program.

64. As such, Dr. Allee viewed female complainants as victims and accused male students as guilty, instead of viewing complainants as accusers and respondents as innocent until proven guilty. This resulted in Plaintiff not receiving a "fair, thorough, neutral and impartial investigation" of alleged sexual misconduct. (See USC Student Code, §17.03 Procedural Rights, subd. D.)

65. The 2014-2015 "Campus Student Conduct Code and Policies" (hereafter the "Code") set forth the disciplinary procedures for cases involving sexual misconduct at USC.

66. The Code required students to "make themselves aware of and abide by the university community's standards of behavior as articulated in the Student Conduct Code and in related policy statements." (USC Student Code §10.00.)

67. The Code prohibited the following:

  A. Causing physical harm to any person in the university community or at university-sponsored activities.

  B. Causing reasonable apprehension of harm to any person in the university community or at university-sponsored activities.

  Note: Self-defense is that which reasonably appears necessary, in view of all the circumstances of the case, to prevent injury and remove oneself from the situation.

(USC Student Code §11.36.)

Use, possession or dissemination of illegal drugs or drug-related
paraphernalia in the university community or at university-sponsored
activities.
(USC Student Code §11.43.)

This policy prohibits a broad continuum of behaviors, including sexual
harassment, sexual assault, sexual exploitation, physical assault, stalking,
and indecent exposure. For all relevant definitions relating to the following
code sections, See Section E.2. Sexual Misconduct.

    1. Engaging in any unwelcome sexual advance, request for sexual favors,
or other verbal or physical or non-consensual sexual conduct or lewd,
indecent or obscene behavior which is sexual in nature within the university
community or at university-sponsored activities, when the conduct has the
effect of unreasonably interfering with an individual's academic or work
performance or creating an intimidating, hostile or offensive academic, work
or student living environment.

    2. Sexual touching, fondling and/or groping, including intentional contact
with the intimate parts of another, causing another to touch one's intimate
parts, or disrobing or exposure of another without permission. Intimate parts
may include the breasts, genitals, buttocks, groin, mouth, or any other part of
the body that is touched in a sexual manner.

    3. Attempted intercourse, sexual contact, sexual touching, fondling
and/or groping.

    4. Non-consensual vaginal or anal penetration, however slight, with a
body part (e.g., penis, tongue, finger, hand, etc.) or object, or mouth to

genital contact.

(USC Student Code §11.53.)

68.A university investigation commenced when a claim of sexual misconduct was reported.  (USC Student Code §17.02.) Student sexual misconduct complaints were directed to USC's Title IX Coordinator.  (*Id*.) Upon learning of a complaint, the Title IX Coordinator or designee contacted the complaining student to explain the student's rights and options.  (*Id*.) USC encouraged students to file criminal reports to USC's Department of Public Safety ("DPS"), who will then report the crime to the Los Angeles Police Department.[34] (*Id*.) If the student wished to proceed with a Title IX campus investigation, the Title IX Coordinator, or a trained Title IX investigator with the oversight of the Title IX Coordinator, was assigned to investigate.  (*Id*.)

69.USC guaranteed a "fair thorough, neutral, and impartial investigation of the incident." (USC Student Code §17.03, Procedural Rights.) The reporting student and accused student were to have equal rights throughout the investigation and appeal process. (*Id*.)

70.The burden of proof was supposed to rest *at all times* with the complainant to show, by a preponderance of evidence, that there was a violation of the student conduct code. (USC Student Code §17.04(D), Standard of Proof.)  The preponderance of evidence is defined as, "[S]uch evidence that, when weighed against that opposed to it, has the more convincing force and the greater probability of truth."  (*Id*.)

71.At the outset of the investigation, the accused was supposed to be provided written notice of the complaint, specifying the alleged violation and the basis for the charge, including the date or period of time and location of the alleged incident.  (USC Student Code §17.03, Procedural Rights.) The accused is provided notice of the published online

---

[34] Although USC medical staff contacted the Los Angeles Police Department in fulfillment of their mandatory reporting duties, Jane Roe declined to participate in a criminal investigation.

1    location of the Code.  (*Id*.)

2        72. During the investigation, the investigator meets separately with both the reporting

3    student and the accused student and explains to each a summary of rights, the

4    investigative process, avenues of appeal, and available resources.  (USC Student Code

5    §17.02, Intake and Investigation.) This is also the opportunity for each party to present

6    relevant information, including names of witnesses and documentary evidence.  (*Id*.)

7        73. During meetings, the parties were permitted to read the investigator's summaries

8    of investigative interviews and verbally respond to the information.

9        74. Both parties may present "supplemental information" until the investigator makes

10   findings.  (USC Student Code §17.02, Intake and Investigation.)

11       75. The parties may inspect documents and information gathered during the

12   investigation *upon request*.  (USC Student Code §17.03, Procedural Rights.)

13       76. The investigator conducts additional investigation and interviews witnesses "as

14   appropriate" and reviews all available, pertinent evidence.  (USC Student Code §17.02,

15   Intake and Investigation.)

16       77. Sexual misconduct investigations are to be completed within 60 days, unless the

17   University's Title IX Coordinator determines special circumstances require a lengthier

18   investigation.  (USC Student Code §17.03, Procedural Rights.)

19       78. Following an investigation, the investigator makes findings of fact and concludes,

20   based on a preponderance of evidence, whether the accused student violated the Code.

21   (*Id*.)  The investigator, in consultation with the Title IX Coordinator, imposes appropriate

22   sanctions on the accused student.  (USC Student Code §17.06, Sanctions.)

23       79. USC does not hold a hearing at any time before or after the investigation to

24   adjudicate claims of sexual misconduct, and the Code expressly denies accused students

25   "the right to confront accusers." (USC Student Code §17.03, Procedural Rights.)

26       80. Upon a finding of responsibility, the investigator, in consultation with the Title IX

27   Coordinator, imposes appropriate sanctions. (AR 206.) Sanctions are subject to review

28   and modification by the Title IX Coordinator before they are issued at the close of the

investigation. (*Id*.) A range of sanctions are available, from a warning to degree revocation, suspension, and expulsion. (*Id*.)

81. The complainant or respondent may appeal the result within two weeks from receipt of the investigator's written decision. (USC Student Code §17.07, Appeals Process.)

82. Appeals at USC were documentary reviews only; no oral testimony was taken, and no oral argument took place.  (*Id*.)

83. Appeals were limited to the following grounds:

- "That new evidence has become available which is sufficient to alter the decision and which the appellant was not aware of or could not have been reasonably obtained at the time of the original review";
- "That the sanction imposed is grossly disproportionate to the violation found";
- "That the conclusion and sanction are not supported by the findings, or the findings are not supported by the evidence in light of the whole record."[35]

(USC Student Code §17.07, Appeals Process.)

84. Character evidence is deemed inadmissible by university policy. (USC Student Code §17.07, Appeals Process.)

85. Appeals were reviewed by an anonymous Student Behavior Appeals Panel ("SBAP"), whose members were appointed by the Vice Provost for Student Affairs. (*Id*.) The SBAP was composed of three members, including at least one faculty member, "who have been trained to hear sexual misconduct case."[36] (*Id*.) The SBAP was advised by a non-voting individual who is trained in USC's procedures and Title IX requirements.

---

[35] The Appeal Request Cover Sheet alternatively provided: "That the investigator failed to follow university rules or regulations while reviewing the cited behavior."  (AR 167.)

[36] There is no description of what USC's "training" entails.

(*Id.*)

86. The Title IX Hearing Coordinator receives all appeals, provides notice to the opposing party, and provides the panel members with the appeal materials in advance of the panel's review. (*Id.*) Upon receipt of the written appeal, the non-appealing party is given two weeks to respond in writing. (*Id.*)

87. The SBAP could uphold the investigator's decision in its entirety, increase or decrease sanctions, remand the case back to the investigator for further investigation, or reverse specific findings of fact not supported by the evidence. (*Id.*) However, the SBAP members **were not permitted to substitute their own opinions** on credibility in place of the judgment of the investigator, nor could the SBAP make new findings of fact. (*Id.*) The SBAP evaluated the evidence and decided only whether the findings of fact were supported by substantial evidence. (*Id.*) The SBAP was not permitted to reweigh the evidence and could not alter the original investigator's decision if they merely disagreed with the findings or sanctions. (*Id.*)

88. Within a week of the conclusion of its review, the SBAP was required to recommend a decision to the Vice Provost for Student Affairs, who had full discretion to accept or modify the recommendation based on his review of the record. (*Id.*)

89. The Vice Provost had authority to make the final decision on appeal, and his decision was final and binding upon all parties. (*Id.*)

## III.   THE ALLEGED MISCONDUCT

90. In the fall of 2014, Mr. Dixon was an eighteen-year-old USC freshmen football tight end, attending USC on a full scholarship.

91. Jane Roe was a twenty-two-year-old USC senior athletic trainer working with USC athletes, including the football team.

92. Prior to this incident, Mr. Dixon was a successful student, maintaining a core 3.0 GPA and playing basketball for St. Bonaventure High School in Ventura California. He was named to the 2013 Prep Star All-American Dream Team, Parade All-American second team, ESPN 300, Cal-Hi Sports All-State second team, Max Preps All-State

Division I second team, Orange County Register Fab 15 first team, All-Ventura County Coaches Association first team, and Ventura County Star All-Area and All Marmonte League.

93. Bryce Dixon met Jane Roe during the summer before he entered USC in the Fall of 2014.

94. Ms. Roe initiated contact with Mr. Dixon by following him on Instagram, and he, in turn, followed her.

95. At some point before October 2014, Mr. Dixon saw Ms. Roe again and they exchanged phone numbers.

96. On October 9, 2014, after a chance meeting at around 3:00 a.m., Mr. Dixon invited Ms. Roe and her friends to swim at his apartment complex.

97. They all went to Ms. Roe's apartment so the women could get bathing suits.

98. Ms. Roe invited Mr. Dixon to her room to charge his cell phone. While he was in there, she took off her clothes and changed into her bathing suit.

99. They began caressing and fondling each other on the bed. One of Ms. Roe's roommates, Erica Capellino, saw the two and said, "I knew it."

100. Ms. Roe and Ms. Capellino left the room together.

101. Approximately 10 minutes later, Ms. Roe returned and said that they were no longer going swimming.

102. She then laid back down on the bed with him and he began "fingering" her.

103. Ms. Roe then said that she did not feel well. So, Mr. Dixon ceased his actions and left, despite being invited to remain.

104. Although Ms. Roe claimed that she "blacked out," Mr. Dixon believed she did not "seem faded."

105. On October 21, 2014, Mr. Dixon initiated a conversation with Ms. Roe via text message.

106. During their text message conversations, Mr. Dixon asked Ms. Roe to "hang out" multiple times.

COMPLAINT FOR DAMAGES

107.   Ms. Roe never declined Mr. Dixon's invitations, and even offered to bring Mr. Dixon food from a nearby restaurant on October 21, 2014.

108.   Ms. Roe and Mr. Dixon carried on a frequent, flirtatious text conversation in the subsequent days.

109.   On October 23, 2014 at 4:30 p.m., Mr. Dixon inquired through text message whether Ms. Roe had plans that evening.

110.   Ms. Roe responded that she was unsure, but that her friends were throwing an "around the world" themed party at an apartment complex near USC.

111.   Mr. Dixon asked if he could attend the party, and Ms. Roe responded affirmatively.

112.   While discussing what they should wear to the party, Mr. Dixon suggested, "U should wear nothing and come to my house and smoke this blunt[.]"

113.   Ms. Roe responded, "Haha yeah good idea :p[.]"

114.   Mr. Dixon then replied, "That's a great idea[.] [A]ctually come through?"

115.   Ms. Roe responded, "Hahah no I'm not going over to your place naked [winking face with stuck-out tongue emoticon][37]."

116.   Mr. Dixon assured Ms. Roe, "I wanna go out[.]  U ain't gotta come over naked lol[.]"

117.   When Mr. Dixon asked Ms. Roe directly if she wanted to stay at his house that night, Ms. Roe did not outright decline, but responded, "Welll I can't guarantee anything[.]"

118.   Ms. Roe' roommates, witnesses Hannah Moehling and Heather Davis, confirmed that they planned to attend a party that night with Ms. Roe.

119.   Heather Davis attested that she and Ms. Roe were together in their apartment for much of the evening "drinking a little.  Not that much.  Just like a margarita or two."

---

[37] During an interview with Mr. Dixon, investigator Keegan Allee characterized the emoticon as an "'ack' face emoticon."  (AR 34.)

COMPLAINT FOR DAMAGES

1    120.   When Hanna Moehling arrived home, Ms. Moehling expressed that she no
2    longer wanted to go to the party.

3    121.   Text messages confirm that around 11:30 p.m., Ms. Roe informed Mr. Dixon
4    that she was no longer planning to attend the party, and she asked Mr. Dixon, "What're
5    you up to?"  When Mr. Dixon suggested, "Smoke a blunt [smiling face with horns
6    emoji]," Ms. Roe replied, "Haha I could smoke a little[.]"

7    122.   Ms. Moehling confirmed that Ms. Roe abandoned her plans to go to the party
8    and instead decided to "go to a friend's and smoke."

9    123.   Knowing that Ms. Roe intended to go to the home of a USC football player,
10    Ms. Moehling reported that she was "giving [Ms. Roe] shit."

11    124.   Ms. Moehling noted that Ms. Roe was "very adamant" that she was "only going
12    to smoke his weed."

13    125.   Heather Davis confirmed that Ms. Roe "kept saying she didn't want to hook
14    up[.]"

15    126.   However, witness Erica Capellino suspected that Ms. Roe planned to "hook up"
16    with Mr. Dixon because she had previously "hooked up with multiple football players."

17    127.   In fact, Ms. Roe was well-known for socializing, partying, and having sex with
18    football players.  She had been dismissed from her position as a student athletic trainer
19    for the USC football team after she was caught having sex with multiple USC football
20    players and "doing inappropriate things in the [training] facilities." She signed a contract
21    agreeing that she would not engage in sexual activity with USC football players.

22    128.   Specifically, Erica Capellino told Dr. Allee that Ms. Roe had been disciplined
23    for having sex with a football player and had entered into a written agreement that she
24    would not do so again. Violating that agreement could result in the loss of her job and
25    loss of the ability to obtain favorable recommendations for graduate school. Intentionally
26    hiding this exculpatory information from Mr. Dixon, Dr. Allee redacted it from Ms.
27    Capellino's interview summary.

28    129.   USC continued to hide this exculpatory information from Mr. Dixon when he

COMPLAINT FOR DAMAGES

requested to see the redacted portions and was advised that "[T]he lines were redacted because they contained statements regarding the character of the Complainant, which are not relevant for purposes of this case."

130.  Around midnight, Ms. Roe rode her bike from her apartment to Mr. Dixon's apartment.

131.  According to Ms. Roe, when she arrived, Mr. Dixon came downstairs and opened the gate for her, and she parked her bike inside the gate and locked it to other bikes in the complex.

132.  Ms. Roe and Mr. Dixon disagreed as to whether Ms. Roe entered his apartment at this time. However, they agreed that soon after she arrived they walked to a taco stand near USC to get food.

133.  Erica Capellino and Heather Davis reported that Ms. Roe attempted to "convince" Hannah Moehling that she was not having sex that night by texting her a "blow by blow" of the evening.

134.  In her "blow by blow" to Hannah Moehling, Ms. Roe described walking to a taco stand on Vermont Avenue after 12:00 a.m., where Mr. Dixon purchased a burrito.

135.  Ms. Moehling then stated, "I'm [a]bout to go to bed though lol def[initely] won't still be up when you're back…"

136.  Neither Ms. Roe nor Ms. Moehling indicated that Ms. Roe intended *not* to have sex with Mr. Dixon.

137.  Ms. Roe and Mr. Dixon agree that as they walked, Mr. Dixon "kept grabbing [her] boobs from behind or grabbing at [her] crotch" over her clothing.

138.  Although during the investigation Ms. Roe claimed that she would "pull his hands away," she never made any complaint about the touching in her detailed text messages. Additionally, she did not go home but instead willingly accompanied Mr. Dixon back to his apartment.

139.  Witness Davonte Nunnery recalled that when Mr. Dixon and Ms. Roe returned to the apartment around 1:00 a.m., Ms. Roe "was in a good mood."

COMPLAINT FOR DAMAGES

140.   Mr. Nunnery, who had moved his bed into the living room because he knew Mr. Dixon was bringing a woman home for the evening, observed Ms. Roe and Mr. Dixon enter Mr. Dixon's bedroom upon arriving back at the apartment.

141.   In contrast to this unbiased witness statement, Ms. Roe claimed that she sat on Mr. Dixon's couch. Dr. Allee made no comment about Ms. Roe's credibility being affected by her inconsistent statements.

142.   What happened after the two entered Mr. Dixon's bedroom was contested.

143.   There was no question that the two had sexual intercourse. However, Mr. Dixon claimed it was consensual while Ms. Roe claimed it was not.

144.   Mr. Nunnery, described hearing "moaning," which sounded to him like "normal sex sounds," and the sexual activity sounded like "it was pleasure" and "[l]ike somebody enjoying it."

145.   Mr. Nunnery's girlfriend, who was in the living room with him, asked him if this was an "everyday thing."

146.   Tellingly, Dr. Allee did not interview Mr. Nunnery's girlfriend, who could have confirmed his statements. In fact, she "did not attempt to contact anyone who had been mentioned during the investigation but not fully identified." *Doe v. Allee* (2019) 30 Cal.App.1036, 1054.

147.   Mr. Dixon recalled Ms. Roe objecting only to his lack of condom. So, he put one on prior to engaging in sexual activity with her.

148.   While Ms. Roe claimed that Mr. Dixon did not wear a condom, Mr. Nunnery's statement once again directly contradicted this, as he stated that he saw the used condom.

149.   Mr. Nunnery was not surprised that Mr. Dixon and Ms. Roe were having sex because she had voluntarily come to Mr. Dixon's apartment in the middle of the night, and their previous interactions had been flirtatious and sexual.

150.   Mr. Dixon initially stated that he ejaculated into the condom he was wearing. He later recalled that he had actually pulled his penis out of Ms. Roe' vagina and removed the condom so that he could ejaculate into Ms. Roe' mouth, but she moved out

of the way.

151.    According to Mr. Dixon, they both laughed when Ms. Roe moved out of the way.

152.    Mr. Dixon summarized that Ms. Roe' words and actions before and during the sexual activity, as well as the fact that Ms. Roe voluntarily came to Mr. Dixon's apartment after midnight and had previously engaged in flirtatious and sexual activity with him, led Mr. Dixon to believe the sexual activity was entirely consensual.

153.    Conversely, Ms. Roe claimed that she was unable to pull away from Mr. Dixon and that she "mentally gave up." She stated that rather than directly saying "no", that she told Mr. Dixon, "'I can't' because I know I'm not allowed to for job purposes." Mr. Dixon purportedly responded, "No one has to know." Ms. Roe recalled that Mr. Dixon "pulled out to finish," and Ms. Roe "went between his legs" and scooted off the bed as Mr. Dixon ejaculated onto the sheets.

154.    She claimed that some of Mr. Dixon's ejaculate got on her shirt, and that she saved the shirt as evidence. However, the shirt was never produced as evidence.

155.    The morning after the sexual encounter, Ms. Roe reported that she called the person she had been dating for six months and told him that she had engaged in sexual activity with Mr. Dixon. Though Ms. Roe did not identify this individual as a witness, and Dr. Allee did not seek to discover the identity of this witness or interview him during the investigation, Mr. Dixon was able to identify the witness as Khalil Jackson, a sophomore at USC on the track and field team.

156.    Mr. Jackson believed the encounter sounded consensual based upon Ms. Roe's description, but he was never interviewed by Dr. Allee to determine whether Ms. Roe's description changed over time.

157.    Ms. Roe also relayed her account of events to her ex-boyfriend, witness Brandon Howard. Mr. Howard was contacted to participate in the investigation and in response submitted a statement that read, "My former girlfriend Diana called me on October 25 for emotional support, telling me she was the victim of sexual assault. I am

sorry that I have nothing further to add to your investigation." Dr. Allee did not ask Mr. Howard any further questions about what Ms. Roe told him about the sexual activity, again failing to confirm whether Ms. Roe's account changed over time.

158.   Ms. Roe's roommate, Erica Capellino, saw Ms. Roe in her room as she was talking to Brandon Howard on the phone the morning after the alleged assault. According to Ms. Capellino, Ms. Roe "seemed really upset." Ms. Capellino reported that Ms. Roe told her "she was drinking and smoking weed" on the couch at Mr. Dixon's apartment, when Mr. Dixon "just got on top of her." Such statement is not supported by Mr. Nunnery's eye witness account.

159.   Notably, Ms. Capellino did not report that Ms. Roe had any visible bruising or injuries.

160.   Later that afternoon, Heather Davis and Hannah Moehling noticed that Ms. Roe "made like a weird comment" and was "rambling" and "really confused." According to Ms. Davis, Jane Roe was "bawling," and she "didn't even know words to say." Ms. Roe recounted that Mr. Dixon "held her down and against her will." Hannah Moehling "was the first to say, 'That's called rape.'"

161.   Ms. Moehling recalled Ms. Roe stating that she had "small little bruises" on the inside of her thigh and arm.

162.   Heather Davis recalled seeing bruises the next day.

163.   On or around October 28, 2014, Ms. Roe contacted a witness identified only as "Mia" to find out what could happen to an athletic trainer who reported a sexual assault perpetrated by a student athlete. Through text messages, Ms. Roe provided a detailed description of the alleged sexual assault that is consistent with the report she later made to USC's Title IX office. Ms. Roe also conveyed, "I'm afraid he's going to tell someone we hooked up and then it'll get back to the trainers…." Ms. Roe also expressed that she was hesitant to report the sexual encounter because she was concerned it could affect her ability to obtain letters of recommendation for graduate school.

164.   About a week after the sexual activity, Ms. Roe texted witness Soma Vainuku,

asking, "How would you respond/think your team would respond if one of your teammates raped someone?" Ms. Roe related a similar series of events to Mr. Vainuku as she had told "Mia."

## IV.    USC'S BIASED INVESTIGATION AND UNSUPPORTED DETERMINATION OF RESPONSIBILITY

165.    On November 5, 2014, Ms. Roe reported the alleged sexual misconduct to USC's Title IX office. When Dr. Allee asked Ms. Roe if she wanted an "Avoidance of Contact" order against Mr. Dixon, Ms. Roe responded, "Yeah, there's no harm in that."

166.    On November 7, 2014, four heavily armed DPS officers barged into Mr. Dixon's apartment to deliver an investigation notification letter and Avoidance of Contact order.

167.    The letter notified Mr. Dixon that "Residential Education" had reported an incident that occurred on October 23, 2014 at Mr. Dixon's off-campus student residence.

168.    Mr. Dixon was accused of violating the following Code sections: 11.32.B (Endangering Others), 11.36.A (Physical Harm), 11.41 (Illegal Use of Narcotics and Paraphernalia), 11.51.A (Harassing or Threatening Behavior), 11.53.A (Sexual Misconduct 1), 11.53.B (Sexual Misconduct 2), 11.53.C (Sexual Misconduct 3), and 11.53.D (Sexual Misconduct 4).  (AR 283.)

169.    Lynette S. Merriman, Ed.D. Associate Provost for Student Affairs, also imposed an immediate interim suspension, banning Mr. Dixon from participating in football games, hosting guests at his apartment, and attending athletic or social events at USC.

170.    On November 11, 2014, Mr. Dixon met with Dr. Allee, unassisted by an advisor, to learn the details surrounding the allegations and to provide a verbal response.

171.    At this initial meeting, before being provided the details of the complaint and the evidence, Mr. Dixon recounted the earlier October 9, 2014 interaction.

172.    Two months later, on January 15, 2015, Dr. Allee questioned Ms. Roe about her interaction with Mr. Dixon on October 9, 2014.

173.   Ms. Roe recounted, "I was pretty drunk.  I don't fully remember.  I was leaving a party at ZBT and I ran into him and his friends on the sidewalk. Collectively we all decided to go swimming at the Lorenzo. So we all go back to my apartment so the girls could get bathing suits. My memory is pretty blurry. I remember feeling sick and throwing up in my bathroom and we never went swimming."

174.   Despite the fact that Mr. Dixon never admitted to "digitally penetrating" Ms. Roe on October 9, Dr. Allee informed Ms. Roe, "He told me that he digitally penetrated you that night."

175.   In her notes, Dr. Allee summarized, "DM's reaction to this news: her chest, throat, and face flushed bright red with splotches of white; her whole body started visibly shaking; she started sobbing."

176.   Dr. Allee obtained Ms. Roe' consent to open a second investigation into the October 9, 2014 interaction to determine whether Ms. Roe lacked capacity to consent to any sexual activity that may have occurred on October 9, 2014.

177.   Revealing that Dr. Allee was predetermining guilt, it is notable that Dr. Allee never questioned Ms. Roe about the amount of alcohol she consumed that night.

178.   On January 22, 2015, during his second meeting with the investigator, Dr. Allee informed Mr. Dixon that a second case had been initiated against him by Ms. Roe, who "did not have any knowledge about that incident because she was drunk."

179.   On February 9 and 10, 2015, Dr. Allee conducted two final interviews with Ms. Roe by phone.

180.   On February 10, 2015, Dr. Allee allowed the parties to view the information collected from these interviews on One Hub, a secure portal that allows documents to be viewed only, but not forwarded, printed, downloaded, copied, shared, or modified in any way.

181.   There is no indication in the record that Mr. Dixon was told this information had been posted on One Hub or was available to view.

182.   The investigation closed the following day, on February 11, 2015.

183. The results of Dr. Allee's investigation were shared with Bryce Dixon and Jane Roe on March 2, 2015.

184. Dr. Allee found Mr. Dixon responsible for sexual misconduct violations and imposed the sanction of expulsion from USC and avoidance of contact with Jane Roe.

185. Dr. Allee determined that Mr. Dixon had violated the following policies regarding the October 23, 2014 allegations:

11.36.B: Causing reasonable apprehension of harm to any person in the university community or at university-sponsored activities. ***Pulling Ms. Roe' hair and putting fingers in her mouth without consent would reasonable cause an apprehension of harm to an individual.***

11.41: Use, possession or dissemination of illegal drugs or drug-related paraphernalia in the university community or at university-sponsored activities. (Also see University Policy on Alcohol and Other Drugs.) ***Mr. Dixon admitted that he smoked marijuana in his campus residence.***

11.53.A: Engaging in any unwelcome sexual advance, request for sexual favors, or other unwanted verbal or non-consensual sexual conduct or lewd, indecent or obscene behavior, which is sexual in nature, within the university community or at university-sponsored activities, when the conduct, has the effect of unreasonably interfering with an individual's academic or work performance or creating an intimidating, hostile or offensive academic, work or student living environment.

11.53.B: Sexual touching, fondling and/or groping, including intentional contact with the intimate parts of another, causing another to touch one's intimate parts, or disrobing or exposure of another without permission. Intimate parts may include the breasts, genitals, buttocks, groin, mouth, or any other part of the body that is touched in a sexual manner.

11.53.C: Attempted intercourse, sexual contact, sexual touching, fondling and/or groping.

11.53.D: Non-consensual vaginal or anal penetration, however slight, with a body part (e.g., penis, tongue, finger, hand, etc.) or object, or oral penetration involving mouth to genital contact.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

***Mr. Dixon, more likely than not, engaged in unwanted sexual conduct that ranged from fondling to vaginal penetration.***

186.   Mr. Dixon was found *not responsible* for violating the following policies: 11.32.B (Endangering Others), 11.36.A (Physical Harm), and 11.51.1 (Harassing or Threatening Behavior.)

187.   Regarding the October 9, 2014 allegations, Dr. Allee found Mr. Dixon *not responsible* for any misconduct. Dr. Allee stated, "While I do find Ms. Roe' distress upon learning of the sexual activity that occurred believable, I do not find that Mr. Dixon knew, or should have known, that she was incapacitated at that time."

188.   The parties were notified of their right to appeal the decision within ten business days of receiving the decision notification.

189.   On April 3, 2015, Mr. Dixon submitted his appeal of the findings and sanctions. Jane Roe did not appeal the findings.

190.   On April 24, 2015, the anonymous SBAP met to review the appeal file.

191.   On May 8, 2015, Roopali Malhotra, senior advisor to the Provost, submitted the SBAP's Appeal Response to Ainsley Carry.

192.   The SBAP noted several shortcomings with Dr. Allee's investigation, including that Dr. Allee: failed to contact the first person with whom Ms. Roe supposedly discussed the sexual encounter, witness Khalil Jackson; conducted no follow up with the Athletic Department to determine the rules and practices regarding relationships between students and athletes, a fact that was contested; declined to grant amnesty to Mr. Dixon for his alleged drug use, when Ms. Roe was granted immunity for the same violation; and placed too much emphasis on certain statements made by Ms. Roe to witnesses before and after the sexual activity with Mr. Dixon.

193.   Nonetheless, the SBAP found that none of the investigatory flaws would have affected the outcome of the investigation.

194.   However, the SBAP did eliminate the policy violation for Section 11.53.C

COMPLAINT FOR DAMAGES

32

(Attempted Intercourse) on the ground that "it is not possible to be found responsible for both an attempted act and the completed act."

195.   On May 12, 2015, Vice Provost Ainsley Carry accepted the SBAP's findings regarding policy violations and the recommended sanction of expulsion, effective immediately.

## V. PETITION FOR WRIT OF MANDATE AND SUBSEQUENT APPEAL

196.   Mr. Dixon challenged the University's decision by filing a petition for writ of administrative mandamus pursuant to Calif. Code of Civil Procedure, § 1094.5.

197.   The trial court, however, denied his writ petition.

198.   Mr. Dixon successfully appealed, the judgment was reversed and the matter remanded to the trial court with instructions to grant Mr. Dixon's Petition. (*Doe v. Allee* (2019) 30 Cal.App.5th 1036, 1071.)

199.   The Appellate Court determined that "Dr. Allee had unfettered discretion to chart the course and scope of her investigation and to determine credibility, and exercised that discretion in questionable ways." (*Doe v. Allee* (2019) 30 Cal.App.5th 1036, 1070.) Expounding upon this, the Appellate Court noted that Dr. Allee immediately rejected Mr. Dixon's theory of the case and failed to follow up with "presumably identifiable and available witnesses." (*Id.*) The Appellate Court also called into question Dr. Allee's unfounded determination that the Athletic Training Department had "knowledge of athletic trainers engaging in consensual activity with athletes and trainers [who] were not fired." (*Id.*)

## VI.   CURRENT STATUS OF USC'S EXTERNAL PRESSURES AND INTERNAL STANCE

200.   Since the initiation of the OCR complaints and investigation into USC's handling of sexual assault claims, USC has perpetuated an anti-male atmosphere in which male students are treated as perpetrators who must be severely disciplined regardless of their guilt or innocence, and female complainants are equated to "victims" and

COMPLAINT FOR DAMAGES

33

"survivors" that must receive preferential treatment and validation.

201.   This pervasive atmosphere of anti-male bias at USC has resulted in an unprecedented amount of litigation in which the California courts have repeatedly held, on numerous occasions, that USC deprived male students of a fair proceeding in adjudicating sexual misconduct allegations:

1)  *John Doe v. Univ. of S. Cal.* (2018) *29 Cal.App.5th 1212*

2)  *Doe v. Carry* (January 8, 2019), California Second Appellate District Division Four Case Number B282164;

3)  *Doe v. Allee* (2019) 30 Cal.App.5th 1036 (this matter);

4)  *Boermeester v. Carry* (2020) 49 Cal.App.5th 682;

5)  *Doe v. Univ. of S. Cal.* (2016) 246 Cal.App.4th 221.

202.   Upon information and belief, USC possesses additional documentation demonstrating its unlawful pattern of gender-biased adjudications and disparate treatment applied to males and females.

203.   Plaintiff is unable to obtain such documentation because USC denies requests citing confidentiality and FERPA.

204.   In 2017, OCR, issued (a) regulations promulgated through notice-and-comment rule making[38] that "have the force and effect of law;"[39] and (b) "significant guidance documents" such as "Q&A on Campus Sexual Misconduct" issued September 2017 and

---

[38] OCR, Revised Sexual Harassment Guidance:  Harassment of Students by School Employees, Other Students, or Third Parties – Title IX (2001) at 36 n.98 (notice of publication at 66 Fed. Reg. 5512 (January 19, 2001) ("2001 Guidance") (https://www2.ed.gov/about/offices/list/ocr/docs/shguide.pdf.)

[39] *Chrysler Corp. v. Brown* (1979) 441 U.S. 281, 295, 301-02 (regulations promulgated pursuant to notice-and-comment rulemaking that affect individual rights and obligations "have the force and effect of law").  The same is true for the 2001 Guidance, an interpretation of the regulations that was published in the Federal Register and was subject to public comment.  (2001 Guidance at ii.)  As such, it is entitled to deference under the doctrine articulated in *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.* (1984) 467 U.S. 837, 842-43.

COMPLAINT FOR DAMAGES

the September 22, 2017 "Dear Colleague Letter."[40]

205.    The September 2017 Q&A cautioned schools to avoid conflicts of interest and biases in the adjudicatory process and to prevent institutional interests from interfering with the impartiality of the adjudication. Decision-making techniques or approaches that apply sex stereotypes or generalizations may violate Title IX and should be avoided so that the adjudication proceeds objectively and impartially.

206.    A school's procedures must, at a minimum, (1) "ensure the Title IX rights of the complainant," but "accord due process to both parties involved,"[41] a requirement applicable to both state and private schools;[42] (2) provide an "adequate, reliable, and impartial investigation;"[43] (3) provide the complainant and the accused student "an equal opportunity to present relevant witnesses and other evidence;"[44] (4) ensure that the "factfinder and decision maker . . . have adequate training or knowledge regarding sexual violence"[45]; and (5) require  proceedings to be documented and include written findings of fact and reports that summarize all evidence, both inculpatory and exculpatory evidence.[46]

207.    When OCR set forth guidance that "in order for a school's grievance procedures to be consistent with Title IX standards, the school must use a preponderance of the evidence standard[47] . . .  "OCR also advised that Title IX has incorporated and

---

[40] Available at: https://www2.ed.gov/about/offices/list/ocr/frontpage/faq/rr/policyguidance/sex.html.

[41] 2001 Guidance at p. 22; see also *Goss v. Lopez* (1975) 419 U.S. 565, 577 (students facing suspension or expulsion have interests qualifying for protection of the Due Process Clause.)

[42] E.g., OCR Ruling re Complaint #04-03-204 (Christian Brothers Univ.) (Mar. 26, 2004) at 7 ("due process protections [are] inherent in the Title IX regulatory requirements").

[43] 2001 Guidance at p. 20.

[44] Id.; 2017 Dear Colleague Letter at p. 3.

[45] Id.; 2001 Guidance at p. 21.

[46] 2017 Dear Colleague Letter at p. 5.

[47] 2017 Dear Colleague Letter, at p. 5.  (the findings of fact and conclusions should be

adopted the procedural provisions applicable to Title VI of the Civil Rights Act of 1964. (See 34 C.F.R. § 106.71.)  The Title IX regulations, therefore, require that decisions be "supported by and in accordance with the reliable, probative and substantial evidence." (See 5 U.S.C. § 556(d).)  5 U.S.C. § 556(d) also provides in relevant part:

208.   . . . A party is entitled to present his case or defense by oral or documentary evidence, to submit rebuttal evidence, and to conduct such cross-examination as may be required for a full and true disclosure of the facts. . .

209.   As a practical matter, therefore, a college student who claims to be the victim of a sexual assault by a fellow student has three options: (1) go to the local police/prosecutor; (2) use the college's sexual assault disciplinary process; or (3) pursue both.[48]

210.   On November 16, 2018, the U.S. Department of Education issued proposed Title IX Regulations[49] that would require all universities that receive federal funding to (1) "provide for a live hearing" at which "the decision-maker must permit each party to ask the other party and any witnesses all relevant questions and follow-up questions, including those challenging credibility";[50] (2) eliminate use of the "single investigator model," whereby the investigator is the sole individual who investigates and makes findings of responsibility;[51] and (3) provide students an opportunity to "inspect and review" all the evidence collected during the investigation, "including the evidence upon which the recipient does not intend to rely in reaching a determination regarding

---

reached by applying either a preponderance of the evidence standard or a clear and convincing evidence standard.)

[48] See 20 U.S.C. § 1092 subdivision (f)(8)(B)(iii)(III) (listing options).

[49] United States Department of Education Office for Civil Rights, Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance, notice of publication at 83 Fed. Reg. 61462 (November 29, 2018) ("2018 Regulations") (https://www2.ed.gov/about/offices/list/ocr/docs/title-ix-nprm.pdf)

[50] 2018 Regulations at p. 53, emphasis added.

[51] 2018 Regulations at p. 66.

COMPLAINT FOR DAMAGES

responsibility."[52]

211.   Former Secretary DeVos, after much public comment and debate through notice-and-comment rulemaking re-wrote the rules put in place by the Obama administration's approach to Title IX enforcement, and the proposed Title IX Regulations took effect in August 2020.

212.   Revealing its continued disdain for due process to the accused, USC's Clery Center issued the following statement, indicating that it would not comply with any OCR guidance with which it did not agree: It is important that "guidance does not leave room for campus processes to be manipulated or abused to only benefit one party."[53]

## VII.   MR. DIXON'S CURRENT STATUS

213.   Throughout the unfair proceedings, Mr. Dixon attempted to maintain his positivity and successfully completed his Freshman year of University.

214.   However, after USC unfairly withheld his grades and transcript, causing him to suffer emotional distress, and feelings of helplessness, Mr. Dixon's life took a turn for the worse.

215.   Raised by his single father after his mother's death when he was just 10 years old, Mr. Dixon had no family or support structure, outside of USC, within the state of California. As a result, he spent his first night after his expulsion from USC housing sleeping on a public park bench. In the months after his expulsion, Mr. Dixon bounced around from one friend's house to another.

216.   The stay imposed by the trial court allowed Mr. Dixon to return to classes at USC, but USC banned him from the football team and denied him access to the athletic training, meals programs, tutoring, and other benefits of his football scholarship that had

---

[52] 2018 Regulations at p. 54.

[53] https://clerycenter.org/article/office-for-civil-rights-issues-dear-colleague-letter-on-title-ix/?utm_content=7ec0049c8d32a3d728e1f88db93654d5&utm_campaign=Office%20for%20Civil%20Rights%20Issues%20Dear%20Colleague%20Letter%20on%20Title%20IX&utm_source=Robly.com&utm_medium=email

helped him to succeed and had also provided structure.

217.   Mr. Dixon's self-destructive actions in the months following his expulsion from USC football provide further evidence of the disastrous and ongoing impact that Defendant's improper actions have had on Mr. Dixon's life.

218.   In January 2016, while Mr. Dixon's Petition for Writ of Mandamus was still pending in the trial court, Mr. Dixon and several new acquaintances committed a series of crimes, including robbery and carjacking.  Mr. Dixon pled nolo contendere to felony charges on April 21, 2016, and was sentenced to six years in state prison.

219.   There is no doubt that USC's disparate treatment of Mr. Dixon contributed to the downturn in his life.

## CAUSES OF ACTION
## FIRST CAUSE OF ACTION
## VIOLATION OF TITLE IX OF THE EDUCATION AMENDMENTS OF 1972 – ERRONEOUS OUTCOME
### 20 U.S.C. § 1681, *et seq.*
### (Against University of Southern California)

220.   Plaintiff repeats and re-alleges each and every allegation hereinabove as if fully set forth herein.

221.   As described more fully above, Title IX requires every college and university that receives federal funds to establish policies and procedures to address sexual assault, including a system to investigate and adjudicate charges of sexual assault by one student against another.  A school violates a student's rights under Title IX regarding student-on-student sexual violence if: (1) the alleged conduct is sufficiently serious to limit or deny a student's ability to participate in or benefit from the school's educational programs;[54] and (2) the school, upon notice, fails to take prompt and effective steps reasonably calculated

[54] OCR requires that the conduct be evaluated from the perspective of a reasonable person in the alleged victim's position, considering all the circumstances.

to end the sexual violence, eliminate the hostile environment, prevent its recurrence, and, as appropriate, remedy its effects.  The fundamental principle of such a system is that it be "prompt and equitable."[55]

222.   Title IX may be violated by a school's failure to prevent or remedy sexual harassment or sexual assault or by the imposition of university discipline where gender is a motivating factor in the decision to discipline. In either case, the statute is enforceable through an implied private right of action.[56]

223.   Gender bias may include, but is not limited to: (1) a primary advocacy on behalf of females who allege males engaged in sexual misconduct; (2) minimal or no advocacy on behalf of males who are alleged to have engaged in sexual misconduct towards females; (3) minimal or no advocacy for protecting females from sexual misconduct perpetrated by other females; and/or (4) minimal or no advocacy for protecting males from sexual misconduct perpetrated by females.

224.   Challenges to university disciplinary proceedings for sex discrimination generally fall into two categories: (1) "erroneous outcome" cases, in which the claim is that plaintiff was innocent and wrongly found to have committed an offense and gender bias was a motivating factor behind the erroneous findings; and (2) "selective enforcement" cases, in which the claim asserts that, regardless of the student's guilt or innocence, the severity of the penalty and/or decision to initiate the proceeding was affected by the student's gender.

225.   To succeed on an erroneous outcome claim, a plaintiff must demonstrate that there was (1) a flawed proceeding that (2) led to an erroneous outcome that was adverse to the plaintiff; and (3) specific circumstances suggesting gender bias led to the erroneous

---

[55] 34 C.F.R. § 106.8 (b).

[56] 42 U.S.C. § 2000d-7 contains an express statutory abrogation of Eleventh Amendment immunity for Title IX lawsuits against states.  In a lawsuit against a public university for a violation of Title IX, remedies are available in law and equity for such a violation to the same extent as such remedies are available for such a violation in the suit against any public or private entity other than a public university.

COMPLAINT FOR DAMAGES

outcome.

226.   An "erroneous outcome" occurred in Plaintiff's case. Plaintiff was innocent and wrongly found to have committed a violation of USC's policies through a flawed proceeding lacking in due process, and gender bias was a motivating factor.

227.   Evidence of gender bias can include external pressures, internal pattern and practice, and facts specific to the instant case.

228.   Plaintiff set forth above the extensive external pressures USC was facing, including the constant threat of loss of federal funds from Assistant Secretary Lhamon, while USC was under investigation by OCR. The loss of federal funds was a substantial pressure, as USC received $592,499,443.00 in federal funds for the 2013-2014 academic year.[57] Describing the immense pressure and the effect of that pressure, Anne Neal of the American Council of Trustees and Alumni said: "There is a certain hysteria in the air on this topic … It's really a surreal situation, I think."[58] Ms. Neal further opined that "schools are running so scared of violating the civil rights of alleged victims that they end up violating the due process rights of defendants instead."[59]

229.   Internal pattern and practice are revealed in the substantial number of successful cases litigated against USC for failing to provide due process and fair hearings to male students and by USC's continued stated opposition to providing due process to male students, as described above.

230.   The specific facts of this matter that reveal gender bias include that Plaintiff was treated as responsible from the outset of the investigation, which was conducted in a manner to cause surprise and undue burdens to Plaintiff. Specifically, Plaintiff's first meeting with Dr. Allee occurred prior to him receiving specific information regarding the

---

[57] See https://studentaid.gov/data-center/student/title-iv.

[58] Tovia Smith, How Campus Sexual Assaults Come To Command New Attention, NPR (Aug. 12, 2014), https://www.npr.org/2014/08/12/339822696/how-campus-sexual-assaults-came-to-command-new-attention

[59] *Id.*

complaint against him. As such, he discussed unrelated incidents.

231.    There was no evidence that Plaintiff committed sexual misconduct.  In fact, witness statements weighed in favor of finding Plaintiff not responsible for sexual misconduct.  Nevertheless, Dr. Allee determined from the beginning to find Plaintiff responsible for violating the Student Code. Dr. Allee intentionally redacted exculpatory information that would support Plaintiff's position that Roe had a compelling reason to make up the allegations (wanting to keep her job). Dr. Allee failed to interview witnesses who would have corroborated that the intercourse was (or at least sounded) consensual both to the person listening and to the person Roe first described it to. Dr. Allee accepted only evidence that supported her predetermination.

232.    Only by picking and choosing which evidence to accept, rather than looking at the evidence in totality and investigating issues by questioning witnesses identified during interviews, was Dr. Allee able to substantiate the charges.

233.    Dr. Allee's conclusions and actions reflect her lack of objectivity and gender bias.

234.    Putting it in the best possible light, the Appellate Court determined that Dr. Allee's actions were "questionable."

235.    As such, it is clear that USC failed to conduct an adequate, reliable, and impartial investigation of the complaint made against Plaintiff.

236.    No live hearing was ever held, thus depriving Plaintiff of the right to cross-examine his accuser.

237.    Although there was an appeals process, it was an appeal in name only. The Panel was not permitted to overturn Dr. Allee's determinations or make new findings.

238.    USC deprived Plaintiff of the benefits of USC's education programs on the basis of sex through its discriminatory, gender-biased implementation of its policies, and by imposing an excessively punitive, unjust punishment of "expulsion" from USC as a result of those Policies.

239.    The University's Policies, as conceived and implemented by USC, were

deliberately designed to favor accusers, who are predominantly women, and to disadvantage the accused, who are predominantly men, by among other things, eliminating from the process fundamental due process safeguards for the accused.

240.   USC initiated and conducted an investigation informed by archaic stereotypes and innate biases that males, including Plaintiff who had never before been suspected of misconduct (sexual or otherwise), are predisposed to aggression, violence, hypermasculinity, and cannot control their impulses when confronted with an intoxicated female.

241.   USC's policy systemically disadvantaged the accused male, depriving him of a hearing in which he could cross-examine his accuser and placing sole authority for investigation, prosecution, and judgment with one person, who had little to no oversight.

242.   USC created an environment in which male students accused of sexual assault were fundamentally denied due process and rights under Title IX, causing a virtual assurance that an accused male would be found responsible.

243.   Furthermore, USC provided disparate levels of support to the female complainant than for Plaintiff, the male respondent. For instance, Jane Roe was given amnesty for illegal drug use, but Plaintiff was not; Jane Roe had an advisor present during her first meeting with Dr. Allee, Plaintiff did not; Dr. Allee failed to confirm Jane Roe's statements regarding the Athletic Department's policies and standards, taking Jane Roe's statements as truth, despite evidence to the contrary. Dr. Allee failed to question witnesses who could contradict Jane Roe's statements, such as Mr. Nunnery's girlfriend and Jane Roe's ex-boyfriend.

244.   Such a biased and one-sided procedure deprived Plaintiff of educational opportunities based on his gender.

245.   USC's Title IX Officials charged with overseeing the Title IX process had actual knowledge and notice of USC's violations of Title IX's inherent requirement to provide an "adequate, reliable and impartial investigation" and "due process to both parties involved."

COMPLAINT FOR DAMAGES

246.   Nevertheless, USC intentionally staffed the Title IX office only with officials who were victim's advocates, failing to provide an opportunity for impartial investigations, discussions, and determinations by staffing the office with individuals who also had a history of supporting rights of the accused.

247.   Defendant knew, or in the exercise of due care should have known, that Plaintiff was denied Due Process and rights under Title IX as set forth in the preceding paragraphs.

248.   Upon information and belief, USC's Title IX administrative procedures were enforced aggressively against male students, while at the same time failing to respond to complaints made by male students against female students.  These actions were deliberately intended to treat males less favorably than females in USC's Title IX proceedings.

249.   Upon information and belief, statistics within the exclusive possession, custody, and control of Defendants will show that accused students are overwhelmingly male and their accusers are overwhelmingly female.

250.   Upon information and belief, statistics within USC's exclusive possession, custody, and control will show a pattern of intentional discriminatory conduct, including that males accused of sexual misconduct by female complainants are invariably found responsible for the charged misconduct.

251.   The outcome of USC's flawed proceedings was clearly erroneous, and the erroneous result was motivated by sex or gender.

252.   Concepts of gender as represented by the university created a hostile environment for young men on campus, resulting in an adverse educational setting in violation of Title IX by interfering with male students' ability to participate in or benefit from various activities, including learning, on USC's campuses.

253.   USC's conduct was so severe, pervasive, and objectively offensive that it denied Plaintiff the equal access to his education and other rights Title IX is designed to protect.

254.   The University punished Plaintiff with severe sanctions following a process that contained virtually no procedural safeguards for accused young men and was permeated with gender bias.

255.   Based on the foregoing, Plaintiff was subjected to a biased, prejudiced and inherently unfair process in violation of Title IX.

256.   This unlawful discrimination in violation of Title IX proximately caused Plaintiff to sustain substantial injury, damage, and loss, including, without limitation, reputational damage, emotional distress, psychological damages, loss of educational and career opportunities, economic injuries and other direct and consequential damages.

257.   As a result of the foregoing, Plaintiff is entitled to injunctive relief and damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements.

## SECOND CAUSE OF ACTION

## VIOLATION OF TITLE IX OF THE EDUCATION AMENDMENTS OF 1972 - SELECTIVE ENFORCEMENT

### 20 U.S.C. § 1681, *et seq.*
### (Against The University of Southern California)

258.   Plaintiff repeats and re-alleges each and every allegation hereinabove as if fully set forth herein.

259.   As described above, the Title IX selective enforcement theory asserts that, regardless of the student's guilt or innocence, the severity of the penalty and/or decision to initiate the proceeding was affected by the student's gender.

260.   As detailed herein, USC violated Title IX's prohibition against selectively enforcing its policies on the basis of gender.

261.   Specifically, USC intentionally discriminated against Plaintiff because he is a male when it initiated the proceeding against Plaintiff despite the total lack of evidence of misconduct, presumed him to be responsible for the alleged misconduct based on archaic

stereotypes about males, permitted an untrained, unqualified individual who exhibited bias against males to act as investigator, prosecutor, judge, jury, and executioner, permitted the investigator to take an adversarial role against Plaintiff, and imposed a "grossly disproportionate" and an excessively harsh and punitive sanction of expulsion without a hearing before neutral adjudicators or an opportunity to cross-examine the complainant and witnesses.

262.   Based on the foregoing, the actions taken and decisions made by USC in carrying out the investigation and adjudication process were informed by Plaintiff's gender, without regard to guilt or innocence.

263.   Upon information and belief, the majority of Title IX cases at USC involve complainants who are female against respondents who are male.

264.   Upon information and belief, Plaintiff was found responsible and expelled because he is a male; given the lack of evidence of misconduct, witness statements supporting that Plaintiff was not involved in any alleged sexual misconduct, and the existence of exculpatory evidence tending to show that Ms. Roe had a reason to fabricate her complaint, there is no other logical explanation for the ultimate outcome.

265.   This unlawful discrimination in violation of Title IX proximately caused Plaintiff to sustain substantial injury, damage, and loss, including, without limitation, reputational damage, emotional distress, psychological damages, loss of educational and career opportunities, economic injuries and other direct and consequential damages.

266.   As a result of the foregoing, Plaintiff is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements.

## THIRD CAUSE OF ACTION
## VIOLATION OF THE UNRUH CIVIL RIGHT ACT
### (Against The University of Southern California)

267.   Plaintiff repeats and re-alleges each and every allegation hereinabove as though fully set forth herein.

COMPLAINT FOR DAMAGES

268.   Upon information and belief, during the Obama Administration, USC acted in response to the federal government's threat that colleges refusing to comply with the mandates of the DCL would be found in violation of Title IX and be subject to substantial monetary penalties.

269.   Upon information and belief, Plaintiff alleges that USC is a business establishment, and as such is prohibited from discriminating against any person on the basis of sex (as defined in California Civil Code §§ 51.5 and 51(e)(5)).

270.   Plaintiff alleges that Defendant USC is a business establishment because USC is a California Corporation and private educational institution that derives a substantial amount of its revenue from the tuition of its students, contributions from alumni and members of the public, and from the use of its facilities by its students and nonstudent members of the public. Due to the substantial revenue Defendant USC receives from members of the public, both students and non-students, Plaintiff believes that USC is a business establishment and is prohibited from discriminating against any person on the basis of sex or gender under California Civil Code §§ 51.5 and 51(e)(5).

271.   Plaintiff alleges that Defendant USC intentionally discriminated against him on the basis of sex by conducting a purposefully flawed and conclusory investigation into the allegations against him that deprived him of his rights to due process and his rights to a fair hearing.

272.   USC failed to provide Plaintiff access to all the evidence and reasonable opportunities to respond, failed to consider all evidence, both exculpatory and inculpatory evidence, failed to provide a live hearing before a neutral adjudicator, and failed to provide an opportunity for Plaintiff to cross-examine the complainant.

273.   As a result of its biased disciplinary and hearing process, USC subjected Plaintiff to erroneous discipline due to his sex. USC discriminated against Plaintiff based on his sex, since he was subject to a biased investigation and unfair hearing, and consequent erroneous discipline despite his innocence.

274.   As a direct and proximate result of Defendants' unlawful actions, Plaintiff has

suffered irreparable harm, injury, and damages, including but not limited to denial of educational opportunities, disciplinary sanctions for having engaged in "sexual misconduct," a notation on his transcripts and academic records restricting, if not destroying, future educational and employment opportunities including undergraduate, graduate school and career choices; false findings and discipline on Plaintiff's record for serious sexual misconduct which did not occur; damage to Plaintiff's standing and associations in his community and imposition of a stigma or other disability that forecloses his freedom to take advantage of other educational or employment opportunities; loss of career opportunities and earning capacity; mental and emotional distress; humiliation and embarrassment; and loss of personal and professional reputation.

275.   This unlawful discrimination proximately caused Plaintiff to sustain substantial injury, damage, and loss, including, without limitation, reputational damage, emotional distress, psychological damages, loss of educational and career opportunities, economic injuries and other direct and consequential damages.

276.   Since USC discriminated against Plaintiff on the basis of sex, USC is in violation of the Unruh Civil Rights Act.

277.   USC's discrimination proximately caused Plaintiff to suffer compensatory damages in the form of economic loss, humiliation, embarrassment, mental anguish, inconvenience, and the deprivation of his civil rights and other items that have yet to be determined, but which will be proven at trial in an amount according to proof. Plaintiff is entitled to attorney's fees according to proof.

278.   As a result of the foregoing, Plaintiff is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements.

# FOURTH CAUSE OF ACTION

## BREACH OF CONTRACT

### (Against The University of Southern California)

279.   Plaintiff incorporates herein by this reference each and every allegation contained in the preceding paragraphs and alleges the same as though fully set forth here.

280.   It is well established that the basic relationship between a student and a university is contractual in nature.  (*Kashmiri v. Regents of Univ. of California* (2007) 156 Cal.App.4th 809, as modified (Nov. 15, 2007), as modified (Nov. 28, 2007).)  "[B]y the act of matriculation, together with payment of required fees, a contract between the student and the institution is created...."  (*Id.*, internal citations omitted.)

281.   At all times relevant hereto, a contractual relationship existed between Defendant USC and Plaintiff through USC's policies and procedures governing student discipline.

282.   Through the documents it publishes and provides to its students, USC made express contractual commitments to students involved in its disciplinary processes.

283.   When Plaintiff enrolled in USC and fulfilled and performed his contractual duties to USC under USC's policies by providing USC with all required and associated tuition, fees and expenses and enrolling in, attending, and maintained good academic standing in his classes, his portion of the contract was fulfilled and USC became obligated to fulfill its duties. When Plaintiff was accused of sexual misconduct, he acted in accord with his obligations under the Student Code of Conduct and fulfilled his "responsibility to participate fully and truthfully in university investigations." (Student Code §17.02) He did so in reliance on his understanding, and with the reasonable expectation that USC would implement, adhere to, and enforce its stated policies, and its policies would comply with the requirements of applicable state and federal laws, including, but not limited to, Title IX.

284.   Based on the foregoing, USC created an express contract, or, alternatively, a contract implied in law or in fact between Plaintiff and USC.

285.   As set forth in this complaint, USC repeatedly and materially breached its contractual obligations to Plaintiff under its express and implied in fact contracts by, among other things, implementing policies and practices which denied Plaintiff rights under Title IX and the right to Due Process and the fair process required by law, were discriminatorily applied to Plaintiff based on his gender, and failed to protect Plaintiff's rights.

286.   As set forth in this Complaint, USC's violations include that Defendant USC denied Plaintiff a fair and impartial investigation, and by denying Plaintiff due process and equal treatment as required by Title IX.

287.   Inherent in USC's contract with Mr. Dixon was an implied covenant of good faith and fair dealing. Such covenant implicitly guaranteed that the University would exercise its discretion in a way that complied with due process and basic fairness. USC violated the covenant of good faith and fair dealing by failing to provide due process to Mr. Dixon and by treating him differently than it treated females.

288.   Additionally, USC breached and violated the covenant of good faith and fair dealing implied in its contracts with Plaintiff by acting arbitrarily, capriciously, and in bad faith throughout the Title IX proceedings, by acting in a manner inconsistent with Plaintiff's reasonable expectations of a fair and impartial process, by depriving Plaintiff of the benefit of their bargained-for education, and by meting out a grossly disproportionate sanction based on unsubstantiated allegations of sexual misconduct, which was later overturned following Plaintiff's successful mandamus action.

289.   USC committed multiple material breaches of its agreements with Plaintiff during the investigation and adjudication process, including, without limitation:

290.   Failing to provide Mr. Dixon with adequate notice of the basis of the complaint against him, which included the "nature of the alleged violation and the basis for the charge including the date or period of time and location regarding the alleged incident." (Student Code §17.03, Procedural Rights.)

291.   Permitting a cursory, superficial, and biased investigation into allegations of

alleged misconduct.  USC was to conduct an investigation that was "fair, thorough, neutral and impartial." (*Id.*)

292.   Failing to impose any procedure to ensure that witness statements were recorded in a complete, credible, accurate, or reliable manner;

293.   Withholding exculpatory information from Mr. Dixon in violation of the Student Code, which provided that "both parties have the right to inspect documents and/or relevant information gathered as part of the investigation." (Student Code §17.03, Procedural Rights.);

294.   Disregarding glaring inconsistencies in witness statements, failing to interview witnesses who might have contradicted Ms. Roe's statements, and failing to confirm Ms. Roe's statement through impartial and unbiased means, such as an interview with the Athletic Department. The Code required that the investigation be "thorough." (*Id.*)

295.   Causing a superficial, conclusory, and pre-ordained "investigative" report to be created based on the opinions and whims of the sole investigator, rather than on the preponderance of the evidence;

296.   Prohibiting live evidentiary hearings before impartial adjudicators;

297.   Employing non-neutral adjudicators trained to "believe the victim" rather than to equitably resolve claims of sexual misconduct;

298.   Failing to provide the most elemental component of due process—the opportunity to confront accusers to test their veracity and credibility;

299.   Authorizing a single individual to investigate, make all factual findings, prosecute, and sentence Plaintiff;

300.   Allowing a rubber stamping of the investigator's findings to further the appearance of fairness and due process without actually providing fairness and due process;

301.   Rendering decisions by applying an unreasonably lax standard of proof in light of the gravity of the charged offense and significance of the potential penalties;

302.   Failing to promptly resolve allegations of sexual misconduct;

303. Rendering a decision against the clear weight of the evidence;

304. Establishing a *de facto* presumption that Plaintiff committed sexual misconduct on the basis of male stereotypes;

305. Providing a disciplinary process that was fundamentally unfair and lacking in Due Process.

306. Defendant further materially breached express representations that it would refrain from discriminating on the basis of sex, gender, gender identity, gender expression or sexual orientation in its programs and activities, including admission and access, and to follow federal and state laws, including Title IX of the Education Amendments of 1972, that prohibit discrimination.

307. As set forth in this Complaint, USC repeatedly and materially breached its express and implied in fact contracts with Plaintiff by wrongfully concluding that he should be subject to sanctions due to its mishandling of its Title IX investigation, administrative process, and hearing and by violating Plaintiff's civil rights.

308. As a direct and foreseeable consequence of the foregoing breaches, Plaintiff sustained damages, including, without limitation, reputational damage, loss of educational and career opportunities, economic injuries and other direct and consequential damages.

309. As a result of the foregoing, Plaintiff is entitled to specific performance and damages in an amount to be determined at trial, plus prejudgment interest and attorneys' fees and costs.

## FIFTH CAUSE OF ACTION
## PROMISSORY ESTOPPEL
### (Against The University of Southern California)

310. Plaintiff repeats and re-alleges each and every allegation hereinabove as if fully set forth herein.

311. USC's various policies constitute representations and promises that USC should have reasonably expected to induce action or forbearance by Plaintiff.

312.   USC expected or should have reasonably expected Plaintiff to accept its offer of admission, incur expenses, and choose not to attend other colleges based on its express and implied promises that USC would not discriminate against Plaintiff and would not deny him his procedural rights should he be investigated for an alleged violation of the University's policies.

313.   Plaintiff relied to his detriment on these express and implied promises and representations made by USC.

314.   Based on the foregoing, USC is liable to Plaintiff based on estoppel.

315.   As a direct, reasonable and foreseeable consequence of these breaches, Plaintiff sustained damages, including without limitation, economic injuries, the inability to complete his studies at USC or transfer to another college of equal caliber, and other direct and consequential damages.

316.   As a result of the foregoing, Plaintiff is entitled to damages in an amount to be determined at trial, plus prejudgment interest.

## SIXTH CAUSE OF ACTION
### GENERAL NEGLIGENCE
### (Against All Defendants)

317.   Plaintiff repeats and re-alleges each and every allegation hereinabove as if fully set forth herein.

318.   In order to state a negligence claim under California law, a plaintiff must show that the defendant owed the plaintiff a duty, defendant breached that duty, and such breach was the proximate cause of plaintiff's damages.

319.   California courts have recognized the "special relationship" that exists between a university and its students, which gives rise to a duty of care "while they are engaged in activities that are part of the school's curriculum or closely related to its delivery of educational services." (*Univ. of S. California v. Superior Court of Cty. of Los Angeles* (2018) 30 Cal.App.5th 429, 443.)

320.   Here, Defendants formed a university-student relationship with Plaintiff and

owed Plaintiff a duty to exercise due care in conducting the disciplinary proceedings against him; in investigating the allegation of sexual misconduct; in ensuring the investigation was free from bias or conflict, and the individuals responsible for investigating and adjudicating the alleged policy violations had received proper training; and in providing him with a fair impartial hearing that did not violate his due process rights and would not subject him to unjust discipline.

321.   USC deprived Plaintiff of the bargained for benefits of his contract with USC and subjected him to economic loss, humiliation, embarrassment, mental anguish, inconvenience, and the deprivation of his civil rights

322.   Such duties arise from Defendants' relationship with Plaintiff, as a student of the University, an obligation acknowledged by USC in its policies.

323.   Additionally, USC also owed Plaintiff a duty to exercise due care under Title IX in providing an equitable investigation and hearing procedure. (34 CFR § 106.8(b) ["A recipient shall adopt and publish grievance procedures providing for prompt and equitable resolution of student and employee complaints alleging any action which would be prohibited by this part."])

324.   The foregoing duties were breached when Plaintiff did not receive the full protections of the disciplinary process, and when he was subjected to a biased and defective procedure.

325.   The foregoing duties were further breached when USC failed to address or remedy the innate, Due Process shortcomings in its policies.

326.   Plaintiff alleges that USC's conduct as alleged herein was the proximate cause of damages to Plaintiff.  By the following acts or omissions to act, USC negligently caused the damages to Plaintiff during or about the 2014 - 2016 school years.

327.   Plaintiff suffered injuries as a direct result of Defendants' breach of the duties owed to him as a student of USC, including, but not limited to, attorney's fees, loss of educational and career opportunities, economic losses, emotional and reputational damages, and subjection to inappropriate and unsupported sanctions.

328.   As a result of the foregoing, Plaintiff is entitled to damages in an amount to be determined at trial, plus prejudgment interest.

## SEVENTH CAUSE OF ACTION

## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

### (Against All Defendants)

329.   Plaintiff repeats and re-alleges each and every allegation hereinabove as if fully set forth herein.

330.   During the investigation and adjudication process, Defendants exhibited extreme and outrageous conduct, including, but not limited to:

a)  Alleging that Mr. Dixon admitted to penetrating Ms. Roe on October 9, 2014, despite no such admission being made;

b)  Finding Plaintiff responsible for sexually assaulting Jane Roe, following a cursory, superficial, and biased investigation into allegations of alleged misconduct;

c)  Prohibiting a live evidentiary hearing before an impartial adjudicator, in contravention of California law and due process;

d)  Failing to provide the most elemental component of due process—the opportunity to confront accusers to test their veracity and credibility;

e)  Authorizing a single individual to investigate, make all factual findings, prosecute, and sentence Plaintiff;

f)  Rendering a decision against the clear weight of the evidence;

g)  Establishing a *de facto* presumption that Plaintiff committed sexual misconduct on the basis of male stereotypes;

h)  Dismissing Plaintiff from school without just cause;

i)  Improperly withholding Plaintiff's grades and transcripts, thereby causing him to unduly suffer and limit his ability to obtain employment; and

j)  Permanently marking Plaintiff's transcript to reflect that he was guilty of sexual misconduct.

331.   Defendants were undoubtedly aware that such public declarations of Plaintiff's guilt would result in irreparable lifelong damages to his name, reputation, academics, and career.

332.   Such extreme and outrageous conduct was either intentional or in reckless disregard that such conduct would in fact cause emotional distress to Plaintiff.

333.   As a direct result of the foregoing, Plaintiff has in fact suffered severe emotional distress including anxiety, stress, depression, hopelessness, humiliation, reputational damages, and mental anguish.

334.   Defendants' actions in investigating and adjudicating the false allegations against Plaintiff were the actual and proximate cause of such distress.

335.   Based on the foregoing, Plaintiff is entitled to damages in an amount to be determined at trial, plus prejudgment interest.


WHEREFORE, Plaintiff John Doe prays for judgment against Defendant USC as follows:

1.   Damages in an amount to be determined at trial, in excess of Seventy-Five Thousand Dollars ($75,000.00) to compensate John Doe's past and future pecuniary and/or non-pecuniary damages, including but not limited to damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational and/or career opportunities, and loss of future career prospects, caused by Defendant's conduct;

2.   Judgment for attorneys' fees, pursuant to any applicable statute;

3.   Judgment for all other reasonable and customary costs and expenses that were incurred in pursuit of this action;

4.   Pre-judgment interest and post judgment interest as may be permitted by law and statute; and/or

5.   Such other and further relief as this Court may deem just, proper, equitable, and

1 | appropriate.

2

3

4 | HATHAWAY PARKER

5 | Dated: June 29, 2021          By:   _____/S/_____.

6 | MARK M. HATHAWAY

7 | JENNA E. PARKER

| Attorneys for Plaintiff

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## JURY DEMAND

Plaintiff John Doe herein demands a trial by jury of all triable issues in the present matter.


HATHAWAY PARKER

Dated: June 29, 2021                    By:    _____/S/_____.
                                               MARK M. HATHAWAY
                                               JENNA E. PARKER
                                               Attorneys for Plaintiff